# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 12, 2025 Session

## STATE OF TENNESSEE v. RODDARRIUS EUGENE JENKINS

**Appeal from the Criminal Court for Davidson County**
**No. 2017-D-2856   Jennifer Smith, Judge**

_____

## No. M2024-01446-CCA-R3-CD

_____

Roddarrius Eugene Jenkins, the Defendant, was convicted of first degree felony murder, especially aggravated robbery, a Class A felony, and being a felon in possession of a firearm, a Class B felony, by a Davidson County Criminal Court jury. *See* T.C.A § 39-13-202 (2018) (subsequently amended) (first degree murder); § 39-13-403 (2025) (especially aggravated robbery); § 39-17-1307 (2018) (subsequently amended) (felon in possession of a firearm). On appeal, the Defendant contends that the trial court erred by (1) violating his Equal Protection rights by denying his motion to appoint a second attorney, (2) denying his motions to suppress his pretrial statements, (3) admitting the Defendant's uncorroborated statements as evidence, (4) denying, at the close of the State's proof, the Defendant's request for a self-defense instruction, (5) restricting the scope of the codefendant's cross-examination, and (6) finding enhancement factors applied to the Defendant's sentence. The Defendant also contends that the evidence is insufficient to support the Defendant's convictions for felony murder and especially aggravated robbery. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Manuel B. Russ (on appeal), and Jodie Bell and Caleb Cassell (at trial), Nashville, Tennessee, for the appellant, Roddarrius Eugene Jenkins.

Jonathan Skermetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Glenn R. Funk, District Attorney General; Paul D. DeWitt and Abby L. Taylor, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions arose from a fatal shooting and robbery committed by the Defendant and the codefendant, Taurus Williams, on May 11, 2017. The Defendant sat outside K building at Dellway Villa Apartments (Dellway) when James Welch, the victim, approached. The Defendant and the victim were in a dispute about both men's relationship with Chasity Hassell. The Defendant had a firearm and testified that the victim reached for the victim's firearm, that both men wrestled for control of each other's firearms, and that the victim was shot four times.

The Defendant was interviewed by police on May 22, 2017, and July 8, 2017, but gave no incriminating statements. The Defendant was indicted on December 15, 2017, and he was served with the indictment during a December 20, 2017 interview. After the interview, he made a jail telephone call in which he implicated himself as shooting the victim and taking the victim's firearm. Ballistic evidence testimony and autopsy evidence were consistent with the Defendant's telephone call statements. The codefendant testified that the Defendant shot the victim. The Defendant testified that he shot the victim in self-defense.

**I. Pretrial**

**A. Pretrial Motion to Appoint a Second Attorney**

The Defendant was represented by private appointed counsel who filed a motion to have a second attorney appointed to represent the Defendant, and the trial court held multiple hearings on the Defendant's motion. The parties stipulated that the Defendant's case was a "complex" first degree murder case, that the Defendant was originally represented by the public defender's office, but that the office withdrew from representing the Defendant due to a conflict of interests. The court then appointed a private attorney to represent the Defendant, but the Defendant asserted that he was entitled to have two attorneys appointed because indigent defendants charged with first degree murder who were represented in the judicial district by the public defender's office were assigned two attorneys while indigent defendants who were appointed private counsel received only one attorney. The Defendant contended that those represented by the public defender's office in the judicial district received state and local funds for their defense while private appointed counsel only received state funds, thereby creating an Equal Protection violation because two groups of similarly situated defendants were being treated differently by the government. At the hearing, the Defendant's appointed attorney offered to withdraw from her appointment and to serve as a pro bono attorney along with whomever the court appointed to represent the Defendant.

The State supported allowing the appointed attorney to withdraw and serve as a pro bono attorney alongside the attorney appointed to represent the Defendant but rejected the Defendant's Equal Protection claim. The court denied the Defendant's motion to appoint a second attorney but allowed the appointed attorney to withdraw and serve as a pro bono attorney and appointed another attorney to represent the Defendant.

## B. Pretrial Motion to Suppress Hearing

The Defendant moved to suppress his statements made during police interviews on May 22, July 8, and December 20, 2017. The Defendant claimed that his *Miranda* rights were violated in each interview because the Defendant could not voluntarily, intelligently, and knowingly waive his *Miranda* rights because of his intellectual capacity. *See Miranda v. Arizona*, 384 U.S. 436, 445 (1966). The Defendant asserted that his Sixth Amendment right to counsel was violated during his December 20 interview because the Defendant had been indicted and because Metropolitan Nashville Police Department (MNPD) Detective Jesse Holt interviewed the Defendant when the Defendant's counsel on federal charges had informed the detective that the Defendant did not want to speak with police. The Defendant contended that Detective Holt's December 20 interview violated the Defendant's constitutional right to an attorney and tainted the Defendant's jail telephone call, which he argued could not be attenuated from the unconstitutional interview because of the brief time between the two events. The State responded that the Defendant's Fifth and Sixth Amendment rights were not violated during his police interviews.

At a pretrial suppression hearing, the State called several officers who interviewed the Defendant before the current case occurred and had advised him of his *Miranda* rights.

MNPD Officer Harrison Nearn testified that he interviewed the Defendant on July 25, 2012, and advised him of his *Miranda* rights. He testified that he had no independent memory of the interview but that his police report reflected that the Defendant was advised of his rights, spoke to police, and confessed that he fled from police and resisted arrest.

MNPD Sergeant Lawrence Brown testified that he interviewed the Defendant on September 24, 2012, and advised the Defendant of his *Miranda* rights using "the standard MNPD Miranda warning." Sergeant Brown said that he determined that the Defendant could read and that the Defendant gave Sergeant Brown no indication that the Defendant was incompetent or incapable of understanding his *Miranda* rights. Sergeant Brown testified that after the Defendant signed a *Miranda* waiver form, the Defendant did not incriminate himself.

On cross-examination, Sergeant Brown acknowledged that he filled out the *Miranda* waiver form and that he left blank the box indicating the Defendant's level of education. He said that he left blank the box indicating whether the Defendant was intoxicated or

mentally impaired because he was "looking at him and speaking with him, if I don't smell alcohol on him, that's not relevant to me."

MNPD Officer Wesley McClellan testified that he arrested the Defendant after a January 4, 2016 traffic stop. He recalled advising the Defendant of his *Miranda* rights and the Defendant's voluntarily answering his questions. Officer McClellan stated that nothing in his encounter with the Defendant indicated that the Defendant was mentally "incompetent" or did not understand his *Miranda* rights. Officer McClellan said that he smelled marijuana coming from the car but that he could not remember the odor emanating from a particular person.

Officer McClellan testified on cross-examination that he "believe[ed]" he advised the Defendant of his *Miranda* rights during the traffic stop. Officer McClellan believed that the Defendant showed signs of intoxication and stated that he did not remember how much time elapsed between his administering the *Miranda* warning and the Defendant's providing a statement.

MNPD Detective Jesse Holt testified that he interviewed the Defendant regarding this incident on May 22, 2017, at the East Precinct in Nashville, and on July 8, 2017, at the Davidson County Jail. Detective Holt stated that the May interview occurred when the Defendant was arrested for an unrelated outstanding warrant. He said that he advised the Defendant of his *Miranda* rights before questioning the Defendant about the victim's shooting. Detective Holt testified that he did not see any indication that the Defendant was intoxicated. A video recording of the May interview was received as an exhibit. Detective Holt stated that the Defendant explicitly affirmed that he understood his *Miranda* rights and that he waived them. The waiver form the Defendant signed was received as an exhibit. Detective Holt said that the Defendant provided an alibi in the May interview, which later proved to be false.

Detective Holt testified that in the Defendant's July interview, he advised the Defendant of his *Miranda* rights, that the Defendant appeared to understand his rights, and that the Defendant showed no signs of intoxication. The waiver form the Defendant signed was received as an exhibit. Detective Holt testified that the interview ended when the Defendant walked away from the detective.

Detective Holt testified that he contacted federal prosecutors about the Defendant's unrelated federal charge in June 2017, as the Defendant had been transferred to federal custody in Crittenden, Kentucky. Detective Holt stated that he interviewed the codefendant, Taurus Williams, who implicated the Defendant as having shot the victim. Detective Holt said that the Defendant and the codefendant were indicted for their

involvement in the victim's death.[1] Detective Holt stated that he interviewed the Defendant and the codefendant separately on December 20, 2017. Detective Holt acknowledged that he knew the Defendant was represented by counsel on the federal charge and an unrelated state charge. Detective Holt said that he advised the Defendant of his *Miranda* rights during their December 20 interview and that the Defendant did not indicate that he did not understand his *Miranda* rights. Detective Holt said that he told the Defendant that he was being charged with murder. Detective Holt testified that the Defendant admitted he lied about his alibi but did not make any incriminating statements. Detective Holt said that he played for the Defendant an excerpt of his interview with the codefendant, in which the codefendant implicated the Defendant as the victim's shooter. The audio recording of the Defendant's interview and the signed *Miranda* waiver form were received as exhibits.

Detective Holt testified he listened to recordings of the Defendant's jail telephone calls that occurred after the December interview. Detective Holt stated that he did not say or do anything to prompt the Defendant to make jail telephone calls after the interviews. Detective Holt said the Defendant made incriminating statements in calls using another inmate's personal identification number. Detective Holt testified that the Defendant made one undated call that occurred after the Defendant's December interview. He noted that he knew the Defendant's phone call occurred after this interview because the Defendant stated in the call that the codefendant identified him as the shooter, information that Detective Holt only told the Defendant in the December interview.

On cross-examination, Detective Holt testified that the Defendant's name was mentioned by others in early interviews that were conducted when Detective Holt investigated the victim's death. He acknowledged that Shantorianna Forte provided a description of the victim's shooter that matched the codefendant. Detective Holt stated that the Defendant did not call a lawyer before the May interview because the Defendant was sequestered after his arrest and before being booked. Detective Holt admitted that he wanted to interview the Defendant before the Defendant obtained a lawyer or made a telephone call. Detective Holt said that he learned the Defendant's phone number before he informed the Defendant of his *Miranda* rights. Detective Holt said that the Defendant admitted that he was "high on Percocets" during his May interview. Detective Holt stated that the Defendant made remarks that he was being asked "trick questions" and that Detective Holt was attempting to "confuse" him. Detective Holt said that he knew that the Defendant was represented by a lawyer for his probation proceedings that were pending in an unrelated case when he interviewed the Defendant in July. Detective Holt admitted that he did not request permission from the Defendant's probation violation attorney to interview the Defendant. Detective Holt said that he told the Defendant that "there are no downsides to making this statement." Detective Holt stated that he knew when he

---

[1] The record reflects that the Defendant's indictments were returned on December 15, 2017.

interviewed the Defendant in December, that the Defendant had been charged in an unrelated federal case and had assigned counsel for that case. Detective Holt denied that he told the Defendant's jailers to tell the Defendant that his lawyer was meeting him as a ruse to have the Defendant come to the interview room. Detective Holt said that he accused the Defendant of shooting the victim in the interview. Detective Holt testified that he sent an email to the jail after the interview and requested that the jail send him the Defendant's jail telephone call recordings from December 20 to December 30. Detective Holt's summaries of the Defendant's jail phone calls were received as an exhibit.

Dr. Pam Auble, an expert in neuropsychology, testified that she examined the Defendant on December 6, 2017, to evaluate his competency for a federal trial. She said that she evaluated him for six hours and determined that he had an IQ score of seventy-four. Dr. Auble noted that the Defendant's IQ meant that ninety-six out of one hundred people were "smarter" than the Defendant. She said that his low cognitive function made him think rigidly about events and that he was unable to perceive changes in testing conditions. She testified that he understood his charges, the basics of the legal system, and that he trusted his lawyer. She stated that she interviewed the Defendant a second time on November 14, 2018, to evaluate whether the Defendant could understand his *Miranda* rights. She administered three tests to determine the Defendant's ability to comprehend his *Miranda* rights. She said that, based on the tests results, the Defendant believed that if he did not sign the *Miranda* warning, he would receive additional charges and that the refusal would be evidence of guilt. She said he also believed that the *Miranda* warning waiver signing was required before he received further information about the circumstances of his case. Dr. Auble agreed that the Defendant would be easily misled by the language of a *Miranda* warning. She stated that the Defendant's December 20, 2017 meeting with Detective Holt would have been hard for him to understand because he was expecting his attorney and that his rigid thinking would have predisposed him to sign the *Miranda* waiver to hear the information the police had about his case. She said that the Defendant would have been upset to learn he was being charged with murder and that his cognitive function would have worsened because he could not contact his attorney after the interview. When asked whether the Defendant understood his *Miranda* rights, Dr. Auble responded:

> I mean, I think he understands the words in them, and I think sentence by sentence he understands -- he understands what his lawyer is and those sorts of things. But he doesn't – it's more of a high-level thing. He doesn't understand that he doesn't have to sign them. At some level he believes that's what he has to do. And he also sees them as ways of getting information from the law enforcement people.

She testified that the Defendant could understand *Miranda* warnings in some circumstances, but not during his interviews with police. She stated that the Defendant

-6-

could not understand the *Miranda* warnings due to his intellectual limitations, mental rigidity, and his belief that not signing the waivers would lead to additional charges and prevent him from receiving information about his case. She said the Defendant could not understand that the evidence-gathering process would be used against him. Dr. Auble's report regarding the Defendant's intellectual capacity was received as an exhibit.

On cross-examination, Dr. Auble testified that the Defendant gave her clear evidence that he understood his federal charges. She stated that the Defendant understood the difference between incarceration and probation. She acknowledged her belief that he was competent to stand trial. She said that the Defendant reported that he finished the eighth grade. She acknowledged that a person's ability to function socially was impacted by the person's environment. She agreed that the Defendant demonstrated his knowledge that he did not have to continue his interview with Detective Holt on July 8, 2017, when the Defendant voluntarily ended the interview. She acknowledged that the Defendant could have waived his *Miranda* rights to gain information about the police investigation.

On redirect examination, Dr. Auble testified that the Defendant did not understand all parts of the *Miranda* waiver he signed and misunderstood that the waiver was a condition precedent to his receiving information from the police.

Davidson County Criminal Court records clerk Toya Randolph testified that the Defendant pled guilty to a charge of being a felon in possession of a weapon on April 14, 2016, and received a sentence of probation. She stated that a probation violation warrant was served on the Defendant on May 22, 2017. She said that the Defendant was represented by counsel in this case. She testified that the Defendant was found to have violated the conditions of his probation and that his two-year probationary sentence restarted on July 12, 2017. She stated that the Defendant posted a bond for the probation violation and that he continued to be represented by counsel until his case was "nullified" by the court on December 13, 2017.

At a second hearing on the motions to suppress on May 28, 2019, Detective Robert Anderson testified that he arrested the Defendant on December 21, 2013, and advised the Defendant of his *Miranda* rights. Detective Anderson said he used one of the department's standardized *Miranda* waiver forms, which the Defendant signed. Detective Anderson testified that the Defendant voluntarily ended the interview.

Detective Holt testified that the Defendant's cell phone was seized before the Defendant's May interview, after the Defendant had been arrested on an unrelated warrant. Detective Holt said that he showed the Defendant the cell phone, that the Defendant voluntarily unlocked it at Detective Holt's request, and that the Defendant instructed Detective Holt on how to locate the cell phone's number. Detective Holt said he told the Defendant that "some of this might be cleared up real quick" if the police were allowed to

search the Defendant's cell phone and that the Defendant "responded yeah and shrugged his shoulders." Detective Holt testified that he understood the Defendant's response as consent for a warrantless search of the cell phone. Detective Holt stated that the Defendant explicitly authorized him to search the Defendant's text messages. Detective Holt also searched the Defendant's cell phone at a later date pursuant to a search warrant.

On cross-examination, Detective Holt testified that he wanted the Defendant's cell phone number so he could reach the Defendant once the Defendant was released from jail. Detective Holt stated that he questioned the Defendant about unlocking the cell phone before the Defendant was advised of his *Miranda* rights. Detective Holt acknowledged that the MNPD's policy regarding informing a suspect of *Miranda* rights did not require a written waiver form. He testified that he did not tell the Defendant that he wanted to search the Defendant's cell phone, and he never specifically asked the Defendant for consent to search the cell phone. He stated that he realized the evidentiary value of the cell phone once the Defendant showed him his contact list. Detective Holt said that he had asked the Defendant for his cell phone number and address while asking the Defendant questions to fill out the *Miranda* waiver form.

The State contended that the motion to suppress the evidence derived from the cell phone should be denied. The State argued that the Defendant orally consented to the search of his cell phone, and that written consent was not required. The Defendant countered that the recording of the interview demonstrated that Detective Holt asked incriminating questions about the Defendant's phone number, address, and name before the Defendant was advised of his *Miranda* rights. The Defendant argued that all evidence obtained from the cell phone must be suppressed.

Detective Holt was recalled and testified that he could not determine what information was derived from the search of the cell phone, from the Defendant's cell phone network provider's records, and from the search of the cell phone pursuant to a warrant. He said that if he had been unable to search the cell phone during the May interview, he would have asked a court to issue subpoenas to all major cell phone providers for any records belonging to the Defendant. He admitted he could have interviewed other witnesses to obtain the Defendant's cell phone number.

On recross-examination, Detective Holt admitted that the Defendant's cell phone was a "Tracfone" and was not registered in anyone's name. He stated that the cell phone number he used to request a judicial order for the Defendant's cell phone records from his network provider was determined during the Defendant's May interview.

The State reasserted that the trial court should deny the Defendant's motions to suppress because the Defendant waived his *Miranda* rights and consented to the search of his cell phone. The State posited that no evidence showed that Detective Holt intentionally

provoked the Defendant to make incriminating telephone calls from the jail. The State argued that the Defendant's request to suppress the jail calls should be denied because the Defendant failed to show any connection between the alleged constitutionally insufficient *Miranda* warning and the Defendant's jail telephone calls.

The Defendant responded that the Defendant's incriminating statements should be suppressed under the Fifth and Sixth Amendments. He argued that under the Fifth Amendment he did not knowingly, voluntarily, and intelligently sign the *Miranda* waivers during his three interrogations because he signed the waiver under the belief that police officers would provide him information about his case. The Defendant supported his contention by relying upon Dr. Auble's testimony of the Defendant's low IQ, mental rigidity, and his inability to understand that his statements to detectives would be used as evidence against him.

The Defendant contended that under the Sixth Amendment, his statements should be suppressed because his right to counsel was violated. The Defendant argued that the Defendant's right to counsel attached when the Defendant's probation violation warrants were issued. The Defendant asserted that because the interviews occurred while the Defendant was on probation, all of his statements to Detective Holt could have been the basis of a probation violation and that the interviews could not be solely about investigating a separate offense. Because the Defendant already had appointed counsel for his probation violation proceedings, and the interviews about other criminal activities could result in an admission that he violated his probation, the Defendant argued that the Defendant's right to counsel was violated when he was interviewed while on probation. The Defendant argued that police intentionally "upset" him by informing him of the first degree murder charge so that he would make a jail telephone call that would contain incriminating information. The Defendant posited that because his Sixth Amendment right to counsel had attached by the time of his December interview, the Defendant's right to counsel was violated by Detective Holt's interviewing the Defendant without his counsel.

The trial court issued a written order denying the Defendant's motions to suppress. The court found that the Defendant was informed of his *Miranda* rights during his May and July interviews. The court found no coercion in the Defendant's interviews. The court discredited Dr. Auble's testimony that the Defendant could not understand the implications of waiving his *Miranda* rights when weighed against the State's witnesses that testified to the multiple times the Defendant encountered *Miranda* warnings and waived his *Miranda* rights.

The trial court found that police did not use "trickery, deceit[,] or deception" during the Defendant's December interview. The court determined that the Defendant was not coerced or forced to make a jail telephone call.

-9-

The trial court found that the Defendant voluntarily gave Detective Holt his cell phone in the May interview when the Detective asked if the Defendant would unlock the cell phone. The court determined that the Defendant consented to the search of the cell phone and that Detective Holt only obtained the Defendant's cell phone number before he informed the Defendant of his *Miranda* rights.

## C. Pretrial Motion Regarding Scope of Cross-Examination

The Defendant argued at a hearing on the scope of cross-examination of the codefendant, that he had a right under the United States and Tennessee Constitutions to question the codefendant about the codefendant's sentencing exposure for related pending charges. The Defendant contended that because the codefendant had not pleaded guilty to his charges before the State elicited his trial testimony, the Defendant was deprived of a fair trial when the court barred his questioning of the codefendant about his sentence exposure. The State responded that the United States and Tennessee constitutions did not entitle the Defendant to question any witness about the potential length or manner of service of a potential sentence. The State conceded that the Defendant could question codefendant Williams about a potential sentence to probe for bias.

The trial court ruled that the Defendant could ask Mr. Williams if he faced a "substantial prison sentence." The court also ruled that the Defendant could not ask further questions regarding whether Mr. Williams was eligible for parole, probation, or any other manner of service. The court relied on Tennessee Code Annotated Section 40-35-201(b), which the court viewed to prohibit questioning of witnesses about their possible sentences in other criminal proceedings and the court's conclusion that Tennessee caselaw was "unduly deferential to the statute."

## II. TRIAL

### A. State's Proof

Bridgette Welch, the victim's mother, testified that the victim was in a romantic relationship with Chasity Hassell.[2] She stated that she did not know whether her son sold drugs and did not believe he owned a firearm. She admitted that she had seen a photograph of her son holding a firearm. She stated that Chasity informed her of her son's death, that she received the victim's cell phone from Chasity, and that she gave the victim's cell phone to the police. Ms. Welch believed that Chasity was involved with her son's death. Ms. Welch stated that she did not believe the victim knew the Defendant or the codefendant.

---

[2] To avoid confusion, Chasity Hassell will be referred to as Chasity to distinguish her from her mother, Tracy Hassell. No disrespect is intended.

On cross-examination, Ms. Welch testified that she discouraged the victim's relationship with Chasity because Chasity was older than the victim.

Chasity Hassell testified that she was the victim's girlfriend at the time of the shooting. She stated that the victim's nickname was "Boosie." She said she knew the Defendant as "Rudy." She testified that she had no relationship with the Defendant. She stated that the Defendant approached her mother the day of the shooting at Dellway because the Defendant had seen her mother at her place of work. Chasity said the victim sent her a text message stating that he was angry that the Defendant approached her mother.

Chasity testified that she saw the victim on the night of the shooting. She stated that she spoke with the victim that night and that she took her children to a neighboring apartment. She said that she returned to the apartment in which she was staying to prepare to go to work and that she was inside K building when she heard gunshots. She stated that someone told her that the victim had been shot, that she ran to the victim, and that he lay on the ground. She testified that she did not find a firearm on the victim and that she did not see the victim with a firearm earlier in the day. She admitted that she had seen the victim with a firearm before that night. Chasity stated that she went to the hospital where the victim was transported and that she gave the victim's cell phone to his mother. Chasity said that she did not see the Defendant the night of the shooting and that she did not go behind K building.

On cross-examination, Chasity testified that the victim's mother and others confronted her at Dellway one to two weeks after the shooting. She stated that two or three people punched and kicked her. Chasity agreed that she sent the victim a text message before the shooting that read "I feel like I am letting a n---- come between our bond and I ain't feeling it." She testified that she possessed Facebook messages with the Defendant dating back to April 1, 2017, that she regularly sent messages to the Defendant before the shooting, and that she did not remember deleting her Facebook messages with the Defendant. She stated that she told Detective Holt that the victim was the "jealous type" and that he suspected her of having intimate relationships with other men. She agreed that she and the victim argued about text messages on May 10, 2017, and acknowledged that she and the victim argued about the Defendant's sending text messages to her. She said she and the victim argued about the nature of her relationship with the Defendant and that she told the victim that the Defendant merely wanted to talk to her mother in the Dellway parking lot. She stated that she lied to the victim when she told him that she had deactivated all her social media accounts. She said the victim had insecurities regarding his relationship with her. She testified that she referenced her children's deceased father when she sent a text message to the victim on May 11, 2017, stating, "I already lost the love of my life to BS. I can't and won't go through it no more." She stated that the victim was referencing the Defendant when he sent her a text message that said, "Buddy is on a thin line in Dellway." She said that on the day of the shooting, she saw the victim shortly after

-11-

she arrived at Dellway. She recalled that she did not see any individuals moving evidence after the victim's shooting.

On redirect examination, Chasity testified that she stayed with Ms. Peterson at Dellway. She stated that she did not call for an ambulance or the police after Ms. Welch "ganged" up on her because "[e]veryone grieves different." She said that she had sent a Facebook message to the Defendant that she thought the victim was coming "between our bond." She testified that she had no intention of ending her relationship with the victim.

Tracy Hassell, the mother of Chasity Hassell, testified that her daughter lived with her but would occasionally stay at Dellway.[3] She stated that she knew her daughter was dating a man nicknamed "Boosie," the victim. She said she knew another man nicknamed "Rudy," who she identified as the Defendant. She recalled that the Defendant approached her at Dellway before the victim's shooting when she picked up her grandchildren from Chasity.

Athena Hayes testified that she worked as an employee for the Crittenden County, Kentucky, Sheriff's Department. She stated that the Crittenden County jail recorded the Defendant's jail telephone call on December 21, 2017. A recording of the call was received as an exhibit.

Davidson County Medical Examiner Dr. Feng Li testified that he performed the victim's autopsy. He determined that the victim died from four gunshot wounds. He said he recovered one bullet from the victim's body, that the bullet wounds indicated the bullets were fired from three feet away or greater, and that the penetration angles indicated that the shooter fired the bullets from a prone position. The victim's toxicology results were positive for marijuana.

MNPD Crime Laboratory firearms expert Ryan Kent testified that he examined a .40-caliber cartridge casing recovered from the scene of the shooting. He said that a 9-millimeter bullet would not function in a firearm that shot a .40-caliber bullet.

On cross-examination, Mr. Kent testified that he did not attempt to match the cartridge casing found at the scene with the bullet fragment recovered from the victim's body because such an analysis was not requested.

Detective Holt testified that he investigated the victim's death. He stated that he located the back of a phone case, a cell phone battery, and a cartridge casing at the crime scene. He determined that the Defendant and the codefendant were potential suspects

---

[3] To avoid confusion, Tracy Hassell will be referred to as Tracy to distinguish her from Chasity Hassell. No disrespect is intended.

based on a witness statement. Detective Holt testified that, during the Defendant's May interview, the Defendant provided an alibi saying that he left Dellway to go to the Arabian Palace before the shooting occurred. Detective Holt stated that the Defendant ended the July interview when Detective Holt accused the Defendant of shooting the victim. Detective Holt said that he interviewed the codefendant on May 19, 2017, and that the codefendant denied any knowledge of the shooting. Detective Holt testified that he interviewed the Defendant and the codefendant separately on December 20, 2017.

Detective Holt testified that he requested recordings of jail telephone calls made by the Defendant after the Defendant's December interview in Kentucky. Detective Holt said he located the December 21, 2017 telephone call that the Defendant made to Shametria Vargus, the Defendant's then-girlfriend. A redacted recording of the telephone call was received as an exhibit and played for the jury. In the recording, the Defendant asked Ms. Vargus if she had seen the "news" on Facebook about the shooting. The Defendant claimed that he "did not do that s---." The Defendant stated that he did not shoot the victim and that the codefendant had implicated him in the victim's death. The Defendant said that he asked "Ra-Ra" for a firearm because he feared the victim would shoot him and that Ra-Ra gave him one. The Defendant stated that he approached the victim, that he told the victim "Don't reach for your gun," that the victim reached for a firearm, and that the Defendant and victim grabbed each other's firearms. The Defendant stated that the victim shot first and that the Defendant shot at the ground. The Defendant stated that "Cha-Cha" shot the victim. Other testimony reflected that Cha-Cha was the codefendant's nickname. The Defendant said that he and Cha-Cha fled the scene and that "we threw the gun and s--- like that and then he threw his gun." The Defendant stated that he knew that the codefendant shot the victim because he was aware that the codefendant sold his firearm after the shooting. The Defendant admitted that "at first I thought I shot him." The Defendant stated that he had a .40-caliber firearm and that he believed the victim was stuck by a 9-millimeter bullet. He said the codefendant admitted to the police that he implicated the Defendant so that the codefendant would not receive jail time.

Detective Holt testified that the Defendant's jail telephone call corroborated physical evidence at the scene. Detective Holt stated that the Defendant's saying that he had a .40-caliber firearm was consistent with the .40-caliber cartridge casing found near where the victim was shot. Detective Holt said the Defendant's admission that he took the victim's firearm and threw it away explained why no firearm was recovered.

On cross-examination, Detective Holt admitted that the physical evidence also corroborated the Defendant's assertion in the call, and the statements by Shantorianna Forte, that the codefendant shot the victim. Detective Holt stated that he was present for two of the codefendant's four interviews. Detective Holt said that the informant who told him about the Defendant and the codefendant being involved in the shooting also named Bryon Shannon, Markell Moore, Tytiana Brown, Tyrell Flanoy, Devonta Hall, and Shakita

-13-

Williams as being present. Detective Holt testified that the shooter was described as having multi-colored dreadlocks. Detective Holt stated that although Chasity minimized her relationship with the Defendant, Facebook messages reflected that the two knew each other well. Detective Holt said he conducted a "phone dump" of Chasity's cell phone. He submitted multiple DNA samples for testing, and the Defendant's DNA did not match any of the blood samples collected from the victim or at the scene of the shooting. Detective Holt said that the DNA sample obtained from the victim's pocket matched the codefendant's DNA.

MNPD crime scene technician Lynnette Mace testified that she photographed the area where the victim was shot, collected the back of a cell phone and a cell phone battery, and located a trail of blood near the scene of the shooting. She testified that a blood-stained t-shirt was found in a nearby dumpster and that a cartridge casing was found underneath a car.

On cross-examination, Ms. Mace testified that unidentified individuals had collected cartridge casings from the scene before police arrived. She acknowledged that the recovered cartridge casing could have come from that night's shooting or an earlier event.

Codefendant Taurus Williams testified that he entered into an agreement with the State to lower his bond from $300,000 to approximately $30,000 in exchange for his testimony. He stated that he posted the lowered bond. He said that, as a codefendant, he faced charges of first degree murder and especially aggravated robbery. He stated that he had not received any promises of leniency for those charges. He admitted he initially lied to police when he said that he had no knowledge of the incident. He stated that he "told most of the truth" to police during his December 20, 2017 interview. He said that he told police he was behind K building on the night of May 11, 2017, and that he intended to hang out with friends. He recalled that he heard gunshots when he saw the Defendant and the victim scuffling. The codefendant stated that he carried a firearm on the night of the shooting. He admitted that he lied to police about firing his firearm into the ground because he shot the firearm "in my pants by accident." He testified that he took "weed" from the victim's pockets after the victim was shot. The codefendant stated that the victim lay on his back, holding his stomach. The codefendant said he lied to police when he said he ran from the victim, jumped over a fence, and fled in a vehicle after the shooting.

The codefendant testified that he feared he might be robbed when he overheard a conversation at K building. He stated that he obtained a firearm from a friend to protect himself. He noted the victim had a firearm while they were shooting dice. The codefendant said he was smoking marijuana when the victim was shot. The codefendant stated that he was sending a text message to arrange for a ride home when he heard the Defendant and the victim "scuffling." He agreed that he was "a few feet" from the Defendant and the

-14-

victim when he heard a gunshot but claimed he did not know who fired the firearm. He said that he ran behind a car in the parking lot when the shooting occurred. He stated that he heard four or five more gunshots once he hid behind the car. He said that he reached for the firearm in his pocket and accidentally shot himself in the leg.

The codefendant testified that he fled towards a fence. He stated that he saw the victim lying on the ground but did not see the Defendant. He testified he attempted to call a friend to pick him up but that his phone's battery was missing. He stated that he ran to a nearby store and that an unknown person agreed to drive him to a hotel. He said that he lost his firearm either in the vehicle or when entering or exiting the vehicle. He noted that neither the Defendant nor anyone else connected with the Defendant spoke to him after the shooting.

The codefendant testified on cross-examination that he had access to the discovery materials for years and had reviewed the materials with his lawyer. He agreed that he faced felony charges and a "substantial prison sentence." He did not believe he was going to be imprisoned in the future. He said that his bond did not include any restrictions on the use of drugs, possession of firearms, or a curfew, but he acknowledged that he wore an ankle monitor. He stated that he had not reviewed his prior statements before trial because he did not have access to a computer.

The codefendant testified that he went to Dellway to smoke marijuana with friends the night of the shooting. He maintained he smoked two grams of marijuana before he arrived and one "joint" while at the apartments. He stated that many people had gathered to listen to music, play dice, and socialize. He said he overheard another person say they wanted to rob someone. He stated that he saw the Defendant beside the dice table before the shooting. The codefendant acknowledged this was the first time he testified to seeing the Defendant before the shooting and that he had not disclosed that information beforehand because he had lied to the police. The codefendant stated that he did not know who started the fight between the victim and the Defendant. The codefendant said he never saw a firearm in either the Defendant's or the victim's possession. The codefendant affirmed that he was the only person to take something from the victim at the scene and that he did not disclose this fact until one year before the Defendant's trial. The codefendant stated he did not help the victim and that he possessed a firearm when he took the victim's marijuana.

The codefendant testified that the police questioned him in the weeks after the shooting and that the police took a DNA sample from him. He stated that during his December 20 interview, he told the police that he would testify that the Defendant was the shooter if "they let me out." He acknowledged that the detectives did not promise him anything during the interview.

-15-

The codefendant testified that he sent a text message to a friend on April 10, 2019, stating that he was to be released from jail on April 25, 2019. He stated that shortly afterward, he received a DNA report that stated his DNA was found in the victim's pocket. He said he received a secondary DNA report on February 14, 2022, that confirmed his DNA was present in the victim's pocket. He testified that he sent a woman a text message on March 16, 2022, that said, "I wish I could talk to you now, but I get out soon."

The codefendant testified that he signed an agreement on May 12, 2022, that granted him prosecutorial immunity for any information he gave to the District Attorney about the incident as long as he did not testify "differently under oath to any material fact." He stated that the meeting was not recorded. He said that on June 17, 2022, he sent a text message to a friend that said, "I swear I can't wait to get out next month so we can get back to doing s---" because he had agreed to be a witness for the State. The codefendant agreed that he had a recorded interview with prosecutors on June 24, 2022. He stated he told prosecutors for the first time that he saw the Defendant in the breezeway of K building, that he overheard others discussing robbing an unknown individual, and that he stole marijuana from the victim. The codefendant affirmed that he could not possess a firearm while he was released on bond and that he posted a photograph of his holding a firearm on September 7, 2022.

The codefendant testified on redirect examination that he did not provide different statements to prosecutors in the unrecorded and recorded meetings regarding his immunity. He stated that he wanted to tell the truth at the meetings with the prosecutors because he was "tired of trying [. . .] to take up for somebody." He said that his interview with the prosecutors was not influenced by the DNA test results. He noted that he did not shoot the victim. He stated that he and a "baby" were the only people present who witnessed the victim's shooting. He admitted someone else could have seen the shooting from a balcony or upstairs window. He said that he sent text messages to friends about getting out of jail because he expressed hope whenever someone asked him about court dates. He noted that Devonta Hall and Bryon Shannon both had dreadlocks like his at the time of the shooting and that Mr. Hall could be mistaken for the codefendant. He stated that he did not know the victim.

The codefendant agreed on recross-examination that he would have "come forward and admit[ed] rifling through [the victim's] pocket" even if the DNA result had not confirmed his DNA was in the victim's pocket. He denied knowing that Shantorianna Forte had reported that a man matching his description shot the victim while standing over the victim. The codefendant agreed he wore a blue jacket the night of the shooting. He stated that he believed Ms. Forte would lie because he assumed she and the Defendant lived in the same apartment complex.

-16-

**B. Motion for a Self-Defense Jury Instruction**

At the close of the State's proof, the Defendant asked the trial court to rule that it would instruct the jury on self-defense at the close of the trial. The Defendant argued that because he did not know whether the court would give the instruction based solely on the State's evidence, he would be forced to testify, which would violate his right against self-incrimination. The Defendant argued that the State's proof showed that the Defendant shot the victim because the victim was armed. The court denied the motion finding, based on the State's proof, that the Defendant had not been imminently threatened by the victim with physical harm. The court noted that the Defendant was not required to testify in the defense's case-in-chief to raise sufficient proof to support a self-defense instruction at the end of the trial and that another witness could provide sufficient proof. The trial court instructed the jury on self-defense in its final instructions.

**C. Defendant's Proof**

Shantorianna Forte testified that she lived in K building at Dellway on May 11, 2017. She stated that drug sales and gambling occurred frequently outside her building. She said that she looked out her apartment windows when she heard gunshots and that she saw an individual standing over the victim, shooting, and going through the victim's clothes. She stated that the individual had black dreadlocks and was wearing a blue shirt and black pants. She heard six to eight gunshots. She testified that she saw no other individuals but the shooter and the victim. She stated that she knew the victim and that she knew he had a girlfriend with whom he argued frequently.

On cross-examination, Ms. Forte testified that she did not know who shot the victim. She said that the Defendant was not the shooter because the shooter had darker skin. She acknowledged that she never saw the shooter's face. She stated that she saw the victim "laying" against her car when he was shot and that the victim collapsed near her car. She said that she and the Defendant became friends after the shooting occurred. She acknowledged that she did not know the codefendant. She stated that she never saw the shooter stand on top of her car. She said she later identified a suspect in a photograph lineup as having dreadlocks like the shooter's, but not because she believed the suspect was the shooter.

A.B., Ms. Forte's sister, testified she lived in K building on May 11, 2017.[4] She did not feel safe testifying about a shooting that occurred in the neighborhood where she lived. She said that she was playing in the field next to K building when she heard gunshots and that she ran to her apartment and looked towards the shooting. She stated that she saw

---

[4] We will refer to the minor witness by her initials.

someone bending over the victim lying on the ground. She denied making a statement to police that she saw an individual with different-colored dreadlocks bending over the victim.

Tanesha Jenkins, the Defendant's sister, testified that she knew Chasity and Tracy Hassell. She said that she, the Defendant, and the rest of her family frequented the Caribbean Hut, where Tracy worked. Ms. Jenkins noted that the Defendant and Chasity were in a relationship and were frequently together at the Caribbean Hut. Ms. Jenkins stated that Chasity visited Ms. Jenkins's mother's house to see the Defendant.

The Defendant testified that the codefendant shot the victim on May 11, 2017. The Defendant said that he had been in an intimate relationship with Chasity since around January of 2017. He knew Chasity was dating the victim when they started their relationship. The Defendant stated that the victim was suspicious of their relationship. The Defendant said that he visited Chasity at Dellway when she stayed at Dornetta Patterson's apartment. He testified that he had two friends at Dellway, "PK" and "Sosa." The Defendant stated he did not know either of his friends' birth names. The Defendant said that he and his friends often gathered behind K building, and because no cameras overlooked the area, they could "shoot dice" and "deal drugs."

The Defendant testified that on May 10, 2017, the day before the shooting, Sosa picked him up and that they drove to the back of K building to "smoke and [] mingle." He said Chasity asked the Defendant to visit her mother. He said he knew Tracy because she booked him as a musician at the Caribbean Hut where she worked. He said the victim and the victim's friend glared at him from the stairwell. The Defendant testified that he did not know the victim, but Chasity had told the Defendant about the victim. The Defendant stated that he knew that the victim sold marijuana and carried a firearm.

The Defendant testified that on the day of the shooting, he and PK waited behind K building for a time slot to become available at the building's unofficial recording studio. The Defendant said that Chasity approached him, told him to come to her apartment, and that she told him that the victim told her to stop "f------ with [the Defendant]." The Defendant noted that he hugged Chasity and that it felt like "it was going to be my last hug[.]" He stated that Chasity's warning changed his view of the victim. He said that he asked PK to ask the victim to mediate between the Defendant and the victim. The Defendant testified that he waited behind K building and that he smoked marijuana laced with cocaine as he waited. He stated that when PK left Dellway, the Defendant remained with PK's friends, "O'Dawg" and "Ra-Ra." The Defendant said that Dellway was very dangerous because he was not from that apartment community. He testified that PK, Sosa, Ra-Ra, O'Dawg, and the victim carried firearms. The Defendant stated that he did not carry a firearm.

-18-

The Defendant said that the victim parked behind K building, approached the Defendant, and aggressively inquired into the Defendant's relationship with Chasity. The Defendant stated that the victim had the victim's hand on the Defendant's forearm while the victim talked to the Defendant. The Defendant said that he could not leave Dellway in a car because PK had driven the Defendant to Dellway and was not currently present. The Defendant testified that he felt threatened by the victim because the victim aggressively approached him with a firearm. The Defendant stated that he went to a nearby car to listen to music while the victim played a dice game. The Defendant said he could see the victim repeatedly reaching for his firearm while playing dice. The Defendant recalled that because he was afraid of the victim, he asked Ra-Ra for a firearm twenty to thirty minutes after the victim confronted him. The Defendant said, "[W]hen I got that gun, my intention was never to get that gun and cause harm and do nothing to that man. I got that gun for protection alone[.]" The Defendant identified a photograph of the victim holding a firearm, which the Defendant said was the firearm the victim had on May 11, 2017. The photograph was received as an exhibit.

The Defendant testified that when the dice game ended, the area behind K building was dark. He said that the victim got into a dark grey Nissan Altima and received a cell phone call. The Defendant said he sat on the sidewalk corner because PK had not returned to drive him home, and he could not enter any other nearby apartment. The Defendant stated that he became afraid when the victim got out of his car and approached the Defendant. The Defendant said the victim placed his hand on the victim's firearm when he passed the Defendant and went into the field next to the sidewalk. The Defendant testified that he told the victim "don't reach for your gun no more." The Defendant stated that he felt threatened by the victim and that he believed the victim had pretended to talk on his cell phone. The Defendant said the victim responded by facing the Defendant and shooting a bullet near the Defendant's head. The Defendant testified that the victim drew his firearm first. The Defendant said he drew his firearm after the victim shot at him. The Defendant stated that he and the victim struggled as they tried to gain control over each other's firearms. The Defendant said that he fired three shots into the grass and dropped the firearm because no bullets were left in the magazine. The Defendant testified that he tackled the victim because the victim's firearm was jammed. The Defendant stated that he wished to disarm the victim and that during the struggle, he heard several gunshots from beside them. The Defendant said that when the victim fell to the ground, he saw the codefendant standing nearby with a firearm. The Defendant stated that he ran from the victim with the victim's and his firearms. The Defendant said he saw the codefendant going through the victim's pockets. The Defendant recalled that he threw the victim's and his firearms into the field next to K building and claimed he never intended to keep the victim's firearm.

The Defendant testified that he lied to police about his alibi because he was scared and did not trust the police. He stated that when Detective Holt visited him for a third

-19-

interview, he believed he was meeting with his attorney. The Defendant said that his subsequent jail telephone call contained seventeen statements of "I didn't do it" which meant "I didn't kill that man" in reference to the victim. The Defendant reiterated that he did not fire the bullet that fatally struck the victim. The Defendant admitted that the "rumors" he referenced in his call were those regarding his relationship with Chasity and that he lied to his girlfriend in the call when he denied the rumors. The Defendant said that he was in control of himself, even though he had smoked marijuana laced with cocaine earlier that day. The Defendant stated that his saying in the telephone call "I need the gun. So I'm like, man, I'm fixing to go on and take his gun" was in reference to the Defendant needing a firearm from Ra-Ra for self-defense. The Defendant said that his reference in the call to "Big K" referred to PK. The Defendant admitted that he was "high" the day of the shooting and did not remember to whom he said that he was going to take the victim's firearm. The Defendant testified that he asked someone else's permission to disarm the victim because he did not live at Dellway. The Defendant stated that had the victim not reached for his firearm, the Defendant would have told the victim about the Defendant's relationship with Chasity. The Defendant said that he referred to the codefendant as a "thug" and that the codefendant told him that the codefendant had to help him because the victim was about to shoot the Defendant. The Defendant noted that he did not plan the shooting with the codefendant and that he believed the codefendant was attempting to shoot the Defendant when the codefendant accidentally shot the victim. The Defendant stated that he knew the codefendant shot a semi-automatic handgun on May 11, 2017. The Defendant acknowledged that he did not know the caliber of firearm he or the codefendant used that night.

On cross-examination, the Defendant testified that the victim glared at him once on May 10 and did not glare at him on May 11. The Defendant stated that he first spoke with the victim on May 11. The Defendant said he asked PK to mediate between him and the victim based on Chasity's warning. The Defendant agreed that he could have walked away from Dellway to avoid a conflict with the victim. The Defendant believed he did not have to leave Dellway because PK had instructed Ra-Ra and O'Dawg to watch out for him. The Defendant stated that he could not ask for a ride because no one in the vicinity owned a car. The Defendant said that the "we" he referred to in his jail telephone call referenced everyone in Dellway. The Defendant testified that he did not retreat from the victim. The Defendant agreed that he lied to Detective Holt in his interviews. The Defendant stated that he spoke truthfully to Ms. Vargus on the phone because he believed no one was listening to his call. The Defendant said that no one, but the codefendant, could have shot the victim. The Defendant testified that Ms. Forte would not have seen him when she looked out her window because he had already fled. The Defendant stated that he did not know the caliber of the bullets in the firearm he shot and that he believed that a firearm could shoot bullets of different calibers.

On redirect examination, the Defendant testified that he did not know Ms. Forte until after his first two interviews with Detective Holt. The Defendant reaffirmed that the victim continually picked up his firearm while playing dice, which made the Defendant afraid. The Defendant stated that no one was around when the victim approached him before the shooting.

## D. State's Rebuttal Proof

The State recalled Detective Holt, and he testified that he showed Ms. Forte a photograph lineup on June 5, 2017. He stated that all the men in the photographs wore dreadlocks and that Ms. Forte picked a "decoy" individual. He said that the lineup included the codefendant, who had dreadlocks. He stated that Ms. Forte commented during her identification that she was certain the individual she chose was the shooter.

On cross-examination, Detective Holt testified that Ms. Forte said she did not see the shooter's face and that she made her identification based upon the color of the dreadlocks and the individual's outfit.

On redirect examination, Detective Holt testified that Ms. Forte was mistaken when she stated she picked the decoy individual because the decoy was the only one with dreadlocks in the photograph lineup, as they all had dreadlocks.

Davidson County Sheriff's Office employee Kim Smith testified that the office's records reflected that the Defendant and Ms. Forte spoke with each other by video thirty-seven times at the jail and that the records did not reflect any contact between them before May 15, 2017.

Upon this proof, the jury found the Defendant guilty of first degree felony murder, especially aggravated robbery, and being a felon in possession of a firearm.

## E. Sentencing Hearing

At the sentencing hearing, the Defendant's presentence report and three certified copies of the Defendant's prior convictions were received as exhibits, but these items are not in the appellate record.

Mackiesha Eubanks, the sister of the victim, testified that the victim had a good temperament and was well-liked. She said that her family remembered her brother's death in various ways and that his death had a large impact on the family.

The State asserted that the Defendant qualified as a Range II offender because he had two prior felonies within two classes of his Class A felony conviction.

-21-

The State argued that Tennessee Rule of Criminal Procedure 32 required the court to impose a consecutive sentence because the Defendant committed his offenses while out on bond for his pending charge for being a felon in possession of a weapon in 2017. The State argued, in the alternative, that the court should impose a consecutive sentence because the Defendant was a dangerous offender. *See* T.C.A. § 40-35-115 (Supp. 2021) (subsequently amended).

The State argued that the proof at trial supported enhancement factors (1) the defendant has a history of criminal convictions or behavior, (2) the defendant was the leader in the commission of the offense with two or more actors, (8) the defendant failed to comply with the conditions of community release, (10) the defendant did not hesitate to commit a crime with a high risk to human life, and (13) the defendant committed the crime while on bail. *Id*. § 40-35-114(1), (2), (8), (10), (13) (2023).

The Defendant argued that he was a Range I offender for the especially aggravated robbery conviction and a Range II offender for the felon in possession of a firearm conviction. The Defendant acknowledged that the judgment for his federal conviction required that his federal sentence be served consecutively to any sentence imposed by the court in this case. The Defendant argued that Rule 32 of the Tennessee Rules of Criminal Procedure did not require the court to impose a consecutive sentence because the Defendant was found not guilty of the charge for which he was on bond at the time of the present offenses.

The Defendant also argued that the proof presented at trial was insufficient to support finding any enhancement factors. The Defendant said the court should find the mitigating factor that "the defendant acted under strong provocation" applied because of witness testimony regarding the "struggle" between the Defendant and the victim. *See id*. § 40-35-113(2) (2023). The Defendant stated that mitigating factor "(3) [s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense" and mitigating factor "(6) [t]he defendant, because of youth or old age, lacked substantial judgment in committing the offense" applied, based on the trial testimony and the Defendant's being twenty-three years old. *Id*. at (3), (6).

The trial court, in its sentencing order, stated that it considered the evidence presented at the trial and sentencing hearing, the presentence report, the principles of sentencing, the nature and circumstances of the offense, and statistical information provided by the Administrative Office of the Courts. The court imposed a mandatory life sentence for the first degree felony murder conviction. The court determined that the Defendant was a Range I offender for the especially aggravated robbery conviction and a Range II offender for the unlawful possession of a weapon by a convicted felon conviction.

The trial court found that enhancement factors (1), (9), (10), and (13) applied. *See id.* § 40-35-114. The court found that enhancement factor (1) applied because the presentence report reflected that the Defendant had been convicted of multiple prior felonies. It determined that enhancement factor (9) applied because the Defendant employed a firearm during the commission of the offense by shooting the victim multiple times. The court determined that enhancement factor (10) applied because the offense occurred in the parking lot of a residential area that had been the scene a of social gathering throughout the night, and it applied enhancement factor (13) because the Defendant was on bail for multiple charges when he committed the present offenses. The court determined that no mitigating factors applied. *See id.* § 40-35-113.

The trial court imposed a sentence of twenty-five years for the especially aggravated robbery conviction, and ten years for the felon in possession of a firearm conviction. The trial court ordered consecutive service because the Defendant had an extensive criminal record, qualified as a dangerous offender whose behavior indicated little or no regard for human life, and committed the offenses while on probation for another offense. *See id.* § 40-35-115(b)(4), (6). The Defendant received an effective sentence of life plus thirty-five years.

## F. Motion for New Trial

In his motion for a new trial, the Defendant reasserted his Equal Protection claim. Metro Nashville assistant public defender Georgia Sims testified that she was familiar with the public defender's office policies regarding client representation. She stated that it was common practice, but not official policy, for the office to assign two attorneys in serious felony cases. She knew of only one attorney in the public defender's office who tried serious felony cases without a second attorney and opined that it was considered "widely inappropriate."

On cross-examination, Ms. Sims testified that experienced attorneys usually were the first chair counsel for serious felony cases and that the less-experienced attorneys served as the second chair counsel. Ms. Sims stated that the elected public defender determined how to allocate attorney resources in the office.

The trial court denied the motion for new trial. This appeal followed.

On appeal, the Defendant contends that the trial court erred by (1) violating his Equal Protection rights by denying his motion to appoint a second attorney, (2) denying his motions to suppress his pretrial statements, (3) admitting his uncorroborated statements, (4) denying his request for a self-defense instruction at the close of the State's proof, (5) restricting the scope of the codefendant's cross-examination, and (6) finding enhancement factors applied to the Defendant's sentence. The Defendant also contends that the evidence

was insufficient to support the Defendant's convictions for felony murder and especially aggravated robbery.

## III. Analysis

### A. Appointment of a Second Attorney

The Defendant contends that the trial court violated his Equal Protection rights under the Fourteenth Amendment, the Tennessee Constitution, and Tennessee statutes by denying his motion to appoint a second publicly-funded attorney to represent him. The Defendant argues that because he was represented by only one attorney, his Equal Protection rights were violated because other similarly situated indigent defendants represented in the same judicial district by the public defender's office were represented by two attorneys. The State counters that the Defendant cannot show prejudice or that the Defendant's fundamental right to counsel was adversely affected because the court allowed the Defendant's originally appointed attorney to withdraw and represent the Defendant on a pro bono basis while the court appointed the Defendant another publicly-funded attorney.[5] This claim is moot.

The Equal Protection provisions within the United States and Tennessee Constitutions "are historically and linguistically distinct," but the Tennessee Supreme Court "has followed the framework developed by the United States Supreme Court for analyzing equal protection claims." *Newton v. Cox*, 878 S.W.2d 105, 109 (Tenn. 1994). The Supreme Court has analyzed Equal Protection claims under strict scrutiny for those that implicate fundamental rights or a suspect class of people. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). Fundamental rights are those "explicitly or implicitly protected by the Constitution[.]" *Id.* at 17. A class is suspect if it is "subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Id*. at 28.

The federal and Tennessee constitutions guarantee the right to legal counsel at trial. *See* U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. The right to counsel has been extended to guarantee that indigent defendants are represented by counsel in felony prosecutions. *Gideon v. Wainwright*, 372 U.S. 335, 343-45 (1963); *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000); Tenn. R. Crim. P. 44(a).

---

[5] The State's brief refers to a further hearing on the motion to appoint second chair counsel on pages 47-48. The State specifically cites to the record volume 14 pages 4, 10 and 13. None of the cited pages exist and the citation is insufficient to support the State's factual assertions.

The justiciability of a case is a threshold inquiry before the merits of a claim may be analyzed. *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013). "Mootness is a component consideration of justiciability." *State v. Sokolosky*, 721 S.W.3d 215, 218 (Tenn. 2025). Generally, our appellate courts will dismiss an appeal as moot "when 'by a court decision, acts of parties, or other causes occurring after the commencement of the action the case has lost its controversial character.'" *West v. Vought Aircraft Indus., Inc.*, 256 S.W.3d 618, 625 (Tenn. 2008) (quoting *McCanless v. Klein*, 188 S.W.2d 745, 747 (Tenn. 1945)). "A case must remain justiciable through the entire course of litigation, including any appeal." *All. for Native Am. Indian Rts. in Tenn., Inc. v. Nicely*, 182 S.W.3d 333, 338 (Tenn. Ct. App. 2005); *see State v. Ely*, 48 S.W.3d 710, 716 n.3 (Tenn. 2001). A case is moot and not justiciable if it "no longer involves a present, ongoing controversy" and "no longer serves as a means to provide some sort of judicial relief to the prevailing party." *All. for Native Am. Indian Rts.*, 182 S.W.3d at 338; *see Knott v. Stewart Cnty.*, 207 S.W.2d 337, 338-39 (Tenn. 1948). The Tennessee Supreme Court has articulated that four circumstances prevent the finding of mootness:

> (1) when the issue is of great public importance or affects the administration of justice, (2) when the challenged conduct is capable of repetition and of such short duration that it will evade judicial review, (3) when the primary subject of the dispute has become moot but collateral consequences to one of the parties remain, and (4) when the defendant voluntarily stops engaging in the challenged conduct.

*Sokolosky*, 721 S.W.3d at 218-19 (citing *Norma Faye Pyles Lynch Fam. Purpose, LLC v. Putnam Cnty.*, 301 S.W.3d 196, 204 (Tenn. 2009)).

The record reflects that the public defender had been appointed to represent the Defendant but was permitted to withdraw due to a conflict of interests, and the trial court appointed a new attorney to represent the Defendant. As the Defendant would have been represented by two attorneys if he were represented by the public defender's office, based on common practice but not policy, he asked the trial court to appoint a second attorney to represent him. The appointed attorney offered to withdraw as appointed counsel and represent the Defendant on a pro bono basis, thus allowing the court to appoint another attorney to represent the Defendant. The court denied the Defendant's motion for a second appointed attorney but permitted the originally appointed attorney to withdraw and represent the Defendant on a pro bono basis. The court appointed another attorney to represent the Defendant. Both attorneys represented the Defendant at the trial.

The Defendant acknowledges that his original motion requested the appointment of a second attorney or dismissal of the Defendant's charges based upon a violation of his constitutional rights. The Defendant's claim was rendered moot when the court permitted the appointed attorney to withdraw and to represent the Defendant pro bono, and the court

-25-

appointed a second attorney to represent the Defendant. The Defendant received the relief he requested—two attorneys represented him at the trial. *See id.* The Defendant's claim "no longer serve[d] as a means to provide some sort of judicial relief to the prevailing party." *All. for Native Am. Indian Rts.*, 182 S.W.3d at 338; *see Knott*, 207 S.W.2d at 338-39. The Defendant is not entitled to relief on this issue.

## B. Motions to Suppress

On appeal, the Defendant contends that the trial court erred in denying his motions to suppress his statements to Detective Holt and his telephone call to Ms. Vargus. The Defendant argues that he did not knowingly and voluntarily sign the *Miranda* waiver when Detective Holt interviewed him and that the interview occurred after he had been appointed counsel on a violation of probation, in violation of his Sixth Amendment rights. He posits that his subsequent statement in his jail telephone call to Ms. Vargus, his girlfriend at the time, was tainted by the unconstitutional interview with Detective Holt and that insufficient attenuation existed between the two statements. As the time between the unconstitutional interview and telephone call was brief, the improper *Miranda* waiver was not extinguished, thus rendering the statement to Ms. Vargus constitutionally impermissible. The State counters that the Defendant waived his *Miranda* rights before he made statements to Detective Holt and that the trial court properly denied his motion to suppress the statements to the detective and in the telephone call. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. To

protect an individual's right against self-incrimination, law enforcement must warn an accused individual before questioning in a custodial interrogation "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. An accused individual may waive the individual's *Miranda* rights if "the waiver is made voluntarily, knowingly, and intelligently." *Id.* at 445. To determine if an accused individual's waiver is valid, the waiver "must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception'" and made "'with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *State v. McKinney*, 669 S.W.3d 753, 768 (Tenn. 2023) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In determining whether a confession is voluntary, a trial court examines the totality of the circumstances, which encompasses "'both the characteristics of the accused and the details of the interrogation.'" *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). The totality of the circumstances test for determining the validity of a *Miranda* waiver is distinct from determining whether a confession is voluntary. *McKinney*, 669 S.W.3d at 765. Relevant circumstances for determining the voluntariness of a confession include the following:

> '[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.'

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)).

A defendant's intellectual disability is among the factors to be considered in a trial court's evaluation of the totality of the circumstances. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000). "As one court has said, 'no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving [. . .] the constitutional rights embraced in the *Miranda* rubric.'" *Id.* (quoting *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)).

-27-

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution afford a criminal defendant the right to counsel and, in the alternative, a right to represent oneself. *See Faretta v. California*, 422 U.S. 806, 814-18 (1975); *State v. Hester*, 324 S.W.3d 1, 30 (Tenn. 2010). The Tennessee Supreme Court has stated that the right to counsel "'is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Sepulveda v. State*, 90 S.W.3d 633, 638 (Tenn. 2002) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). A Defendant's right to counsel does not attach when charges are pending in one criminal proceeding and police gather evidence for another criminal proceeding. *McNeil*, 501 U.S. at 175-76 (citing *Maine v. Moulton*, 474 U.S. 159, 179-80 (1985)).

In *State v. Huddleston*, the Tennessee Supreme Court adopted the fruit of the poisonous tree doctrine in the context of the Fourth Amendment. 924 S.W.2d at 674 (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Under the fruit of the poisonous tree doctrine, evidence that is properly attenuated is evidence where "the presence of the intervening circumstances purged the taint of the illegal" conduct. *Id*. at 675. The Tennessee Supreme Court has stated that Sixth Amendment "[r]ight to counsel violations that do not affect the entire proceeding are subject to harmless error review." *Cottingham v. Cottingham*, 193 S.W.3d 531, 537 (Tenn. 2006). If the right to counsel violation is structural error, in that it "affect[s]—and contaminates[s]—the entire criminal proceeding[,]" the remedy is automatic reversal of the defendant's convictions. *Id*. (citing *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988)).

The record reflects that the Defendant was informed of his *Miranda* rights during his May 22, July 8, and December 15, 2017 interviews. Recordings of the interviews were received as exhibits but were not included in the record on appeal. Therefore, Detective Holt's testimony is the only evidence of the sequence of events during the Defendant's interview. Detective Holt testified that the Defendant was informed of his *Miranda* rights and waived those rights during each interview. Detective Holt stated that the Defendant did not make incriminating statements before he waived his *Miranda* rights. Dr. Auble testified that the Defendant could not fully understand the implications of waiving his *Miranda* rights. Dr. Auble stated that the Defendant could understand his *Miranda* rights with the proper time and explanation provided to him. However, the trial court credited the State's multiple police witnesses that detailed the Defendant's history of receiving his *Miranda* warnings, his understanding of his rights, and his waiving his rights, as opposed to Dr. Auble's testimony that the Defendant's waiver was given without his understanding its full implications. Furthermore, the court reviewed the interview recording, which is not in the record on appeal, in determining whether the Defendant understood his rights. Because the appellate record is incomplete, as it does not include the recording that the trial court considered, "this [c]ourt must conclusively presume that the ruling of the trial

-28-

court was correct in all particulars." *State v. Miller*, 737 S.W.2d at 558 (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). The record does not preponderate against the trial court's findings.

The record reflects that the Defendant was appointed an attorney in an unrelated state probation violation proceedings before his December 20, 2017 interview. Detective Holt testified that the Defendant did not make any incriminating statements during his December interview and that the Defendant only made incriminating statements in the jail telephone call after the interview. The Defendant was indicted in the instant case on December 15, 2017. The indictment was served on the Defendant during his December 20, 2017 interview, and the Defendant waived his right to counsel and recanted his alibi.

The Defendant contends that the Defendant's right to counsel attached before his December interview because any testimony about the present case could have impacted his probation violation proceedings. *But see McNeil*, 501 U.S. at 175-76 (citing *Moulton*, 474 U.S. at 179-80) (holding that a defendant's right to counsel does not attach when charges are pending in one criminal proceeding and police gather evidence for another criminal proceeding). The Defendant's right to counsel in his probation revocation proceeding was not implicated when Detective Holt interviewed the Defendant on a separate matter. *See McNeil*, 501 U.S. at 175-76. The Defendant's right to counsel for the present case attached when the Defendant was indicted on December 15, 2017. *See Sepulveda*, 90 S.W.3d at 638. However, Detective Holt's testimony established that the Defendant was informed of his *Miranda* rights and waived his rights during his December 20 interview, after being served with the indictment.

The Defendant contends that his subsequent jail telephone call on the same day of his December interview should have been suppressed because it was not attenuated from his claimed tainted interview. However, the record establishes that the Defendant waived his *Miranda* rights during his interview and that no violation of the right to counsel occurred in the interview. Therefore, the Defendant's attenuation claim is not well-founded because the Defendant's constitutional rights were not violated, and the jail telephone call he made to Ms. Vargus was voluntary and admissible evidence. *See Huddleston*, 924 S.W.2d at 673-74. The trial court did not err in denying the Defendant's motion to suppress, and he is not entitled to relief on this issue.

## C. Defendant's Telephone Call Statements

The Defendant contends that the trial court erred in admitting the Defendant's statements made to Ms. Vargus during his December 20, 2021 jail telephone call.[6] The Defendant claims that the statements he made during the call were not corroborated for their trustworthiness and should not have been admitted into evidence. The State responds that the trustworthiness of the statements was established and that the trial court properly admitted the statements as evidence. We agree with the State.

Our supreme court in *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014), adopted the modified trustworthiness standard for establishing corroboration of a defendant's extrajudicial statements. In *Bishop*, the court stated that "a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces 'independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury.'" *Id.* at 58 (quoting *State v. Lucas*, 152 A.2d 50, 60 (N.J. 1959)). If the charged offense involves a tangible injury, the State is required to "provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred." *Id*. at 59.

A trial court's determination of whether a defendant's extrajudicial admission or confession is sufficiently corroborated is a mixed question of law and fact, and the standard of review on appeal is de novo. *Id*. at 62. Our supreme court has also made clear that "[t]he corroboration requirement is a low threshold." *State v. Clark*, 452 S.W.3d 268, 280 (Tenn. 2014). Once the State meets that evidentiary threshold, the jury may consider the credibility of the statement along with any other supporting or conflicting evidence. *Bishop*, 431 S.W.3d at 61. *Bishop* tasks the trial court, rather than the jury, with making the threshold evidentiary determination regarding corroboration. *Id*.

Felony murder requires the State to "(1) corroborate the fact that someone died and (2) establish the trustworthiness of [a defendant's] confession." *Id*. at 62. Independent corroboration of every element of the crime is not required. *Id*. "The 'loss or injury' at issue in a felony murder is not the predicate felony, but rather the death that occurred during the commission of the felony." *Id*. (citing *State v. Banks,* 271 S.W.3d 90, 140 n. 32 (Tenn. 2008).

---

[6] The Defendant erroneously cites to his pretrial motion to suppress in volume 1, pages 33 to 43, which does not address suppression of the Defendant's jail telephone call. The Defendant is reminded that it is the Defendant's burden to prepare a proper record for appellate review. *See* T.R.A.P. 25(b); Tenn. R. Ct. Crim. App. 10(b).

The Defendant argues that the State produced insufficient corroborative testimony to support the trustworthiness of the statements he made on a jail telephone call recording. The Defendant asserts that the State did not introduce any evidence to support the Defendant's incriminating statement that he robbed the victim. However, the Defendant incorrectly focuses on the corroboration of the predicate felony for purposes of felony murder and not the injury caused to support the conviction for felony murder. To support the felony murder conviction, the State needed only to establish the trustworthiness of the Defendant's statements regarding the injury element of the felony murder charge. *See id.* at 62. The record reflects that the State corroborated that the victim died through the testimony of the codefendant, Dr. Li, and Chasity. The record also reflects that the State presented proof through the codefendant that the victim was shot while he and the Defendant were fighting. Dr. Li's testimony corroborated that the victim died as a result of four gunshot wounds. The recording of the Defendant's call reflects that he believed he shot the victim initially and that his belief that he shot the victim would be confirmed if the victim's autopsy revealed that the victim died due to a .40-caliber bullet. Dr. Li's testified that the victim was struck by a .40-caliber bullet. Therefore, the State presented evidence that the Defendant was fighting the victim when the victim was fatally struck by a .40-caliber bullet. The State's proof closely mirrors the Defendant's statements and corroborated the fact that the victim died. Accordingly, the related proof and Defendant's statements sufficiently established the trustworthiness of the Defendant's statements and rendered them admissible. *See id*. The Defendant is not entitled to relief on this issue.

### D. Self-Defense Instruction

The Defendant claims that the trial court erred, after the close of the State's proof in denying the Defendant's request for a self-defense jury instruction at the end of the trial based solely on the proof offered by the State in its case-in-chief. The Defendant contends that the trial court erred by failing to rule on the motion for a self-defense instruction that he made at the close of the State's case-in-chief. He argued that, because he did not know whether the court would give the instruction based solely on the State's evidence, he was forced to testify, which violated his right against self-incrimination. The State responds that the trial court properly denied the Defendant's request for a self-defense jury instruction based solely on the State's proof. We agree with the State.

The Tennessee Supreme Court has held that "an appellate court has limited discretionary authority to review unpreserved and unpresented issues." *State v. Bristol*, 654 S.W.3d 917, 923 (Tenn. 2022). "An appellate court cannot consider an issue which is not preserved in the record for review." *State v. Banes*, 874 S.W.2d 73, 82 (Tenn Crim. App. 1993) (overruled on other grounds). Parties are bound by the grounds asserted when the objection was made at trial and waive issues on appeal when new grounds are asserted in the motion for new trial or in this court*. State v. Howard*, No. M2020-01053-CCA-R3-CD, 2021 WL 5918320, *6 (Tenn. Crim. App. Dec. 15, 2021) *no perm. app. filed*.

-31-

Tennessee Rule of Appellate Procedure 24(b) requires that a Defendant "prepare[s] a transcript of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that bar the bases of appeal." This court is precluded from considering an issue and conclusively presumes that the trial court's judgement was correct when the record on appeal is incomplete. *State v. Matthews*, 805 S.W.2d 776, 784 (Tenn. Crim. App. 1990).

On appeal, the Defendant claims that his constitutional right against self-incrimination was violated because the court's ruling required the Defendant to testify. However, the Defendant argues in his motion for new trial that the trial court erred in denying the Defendant's request for a self-defense jury instruction because the Defendant's jail phone call, admitted during the State's case-in-chief, raised sufficient proof to support a self-defense instruction. "An appellant cannot change theories from the trial court to the appellate court." *See Banes*, 874 S.W.2d at 82. Furthermore, the Defendant has not cited any authority for the proposition that he was entitled to a ruling on his motion for a self-defense jury instruction before he began his case-in-chief, and we are unaware of any such principle of law. The trial court did not err in denying the Defendant's motion for self-defense instruction based upon the evidence presented in the State's case-in-chief. The trial court instructed the jury on self-defense at the conclusion of the trial. The Defendant is not entitled to relief on this issue.

## E. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for especially aggravated robbery and first degree felony murder. The Defendant claims that his especially aggravated robbery conviction should be dismissed because his jail telephone call did not support a verdict that he robbed the victim or that he was criminally responsible for the victim's being robbed. The Defendant also contends that if the proof for his robbery conviction is insufficient, then his felony murder conviction should be dismissed for a lack of a predicate conviction. The State responds that the evidence is sufficient to support the Defendant's convictions. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *Hanson*, 279 S.W.3d 269, 275 (Tenn. 2009)).

"It is well established that the identity of the perpetrator is an essential element of any crime." *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). We apply the same standard of review, whether the evidence is direct or circumstantial. *Dorantes*, 331 S.W.3d at 379.

First degree felony murder is

> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, robbery, burglary, theft, kidnapping, aggravated abuse of an elderly or vulnerable adult in violation of § 39-15-511, aggravated neglect of an elderly or vulnerable adult in violation of § 39-15-508, aggravated child abuse, aggravated child neglect, or aircraft piracy[.]

T.C.A. § 39-13-202(a)(2). Felony murder does not require an independent culpable mental state, "except the intent to commit the enumerated offenses or acts in those subdivisions." *Id*. at (b).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*. § 39-14-103. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401. Especially aggravated robbery is robbery "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." *Id*. § 39-13-403. "Especially aggravated robbery is a Class A Felony." *Id.*

The Defendant centers his argument on the proposition that, if the jail telephone call recording is inadmissible, then the especially aggravated robbery conviction must be dismissed. Contrary to the Defendant's argument on appeal, even if the admission of the jail telephone call was erroneous, this court reviews sufficiency of the evidence claims based upon all evidence received at trial. *See State v. Longstreet*, 619 S.W.2d 97, 101 (Tenn. 1981). As we have previously determined, the recording was properly received as

evidence. The Defendant further contends that even if the recording was properly admitted, the evidence is insufficient to prove that the Defendant intended to deprive the victim of his firearm. The State responds that the recording, along with witness testimony, provided sufficient evidence for a jury to find the Defendant guilty of especially aggravated robbery.

The codefendant and the Defendant testified that they saw the victim with a firearm. The Defendant testified that he was armed, that he approached the victim, and that he and the victim struggled over their firearms. The Defendant stated he left the scene with the victim's and his firearms and later disposed of the firearms. The Defendant deprived the victim of his firearm. The codefendant said that the victim was armed when the Defendant approached the victim. Chasity testified that she did not see a firearm near the victim when she went to him immediately after the shooting. The Defendant's statements to Ms. Vargus on the recorded jail telephone call demonstrated that the Defendant planned to take the victim's firearm. The victim's firearm was never recovered. The victim died as a result of the gunshot wounds that he suffered during the struggle with the Defendant.

Accordingly, any rational trier of fact could determine that the Defendant intended to deprive the victim of his firearm by force or violence or by the use of a deadly weapon that resulted in the victim's death. The jury credited the codefendant's and Chasity's testimony and the jail phone call over the testimony of the Defendant. First degree felony murder does not require an independent mental state, "except the intent to commit the enumerated offenses or acts in those subdivisions." *Id*. § 39-13-202(b). Theft is one of the enumerated offenses in the first degree felony murder statute. *Id*. (a)(2). Accordingly, the evidence is sufficient to support the Defendant's especially aggravated robbery conviction, and the underlying felony supports the Defendant's felony murder conviction. The Defendant is not entitled to relief on this issue.

## F. Scope of the Codefendant's Cross-Examination

The Defendant argues that the trial court unconstitutionally restricted the cross-examination of the codefendant when it limited the Defendant's asking the codefendant questions regarding the specifics of his sentencing exposure. The court determined that the codefendant could only be asked if he faced "substantial" punishment. The State responds that the court properly restricted the scope of the cross-examination because the codefendant and the Defendant were charged with the same crimes and that asking the codefendant about specific sentencing exposure would have informed the jury of the Defendant's sentencing exposure, which was in violation of the law. We agree with the State.

"[C]ross-examination is a fundamental right." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "[A] denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to

a fair trial.'" *Id.* (quoting *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). "The propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012). A defendant's constitutional right to cross-examine witnesses remains subject to general rules of relevance and concerns such as presentation of cumulative or marginally relevant information. *See* Tenn. R. Evid. 403; *Reid*, 882 S.W.2d at 430. Generally, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fenstereer*, 474 U.S. 15, 20 (1985); *see Pennsylvania v. Ritchie*, 480 U.S. 39, 52-53 (1987); *State v. Rimmer*, 623 S.W.3d 235, 290 (Tenn. 2021).

Tennessee Code Annotated Section 40-35-201(b) (2025) stated that:

(b) In all contested criminal cases, except for capital crimes that are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, Article VI, § 14 and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

The record reflects that the trial court ruled that the Defendant could ask the codefendant about the "substantial prison sentence" that he faced but not about whether he was eligible for any other manner of service. The court based its determination on Tennessee Code Annotated Section 40-35-201(b)'s prohibition on questioning witnesses about their possible sentences in other criminal proceedings. The record reflects that the trial court did not abuse its discretion in denying the Defendant's request to confront the codefendant using sentencing specifics. Further, the record reflects that the Defendant thoroughly cross-examined the codefendant about the fact that he cooperated with the State only after he received DNA results implicating him in the victim's death, that he repeatedly lied to police, that he faced a "substantial prison sentence," that his bond was drastically reduced after he agreed to testify, that he had an agreement with the State, and that he received minimal restrictions while out on bond. The Defendant's cross-examination of the codefendant amply revealed the codefendant's basis for bias and generally informed the jury of the severity of the prison sentence that the codefendant faced if he did not cooperate with the State when he testified. Accordingly, the court did not abuse its discretion in limiting the cross-examination of the codefendant. The Defendant is not entitled to relief on this issue.

## G. Sentencing

The Defendant argues that the trial court erred in sentencing the Defendant by applying the enhancement factor for committing a crime when the risk to human life was

-35-

high.  *See* T.C.A. 40-35-114(10).  The Defendant does not contest the court's application of the other enhancement factors.  The Defendant claims the trial court erred in finding that the Defendant was a dangerous offender for the purposes of imposing consecutive sentencing.  *See* T.C.A. 40-35-115(b)(4).  The State contends that the trial court did not abuse its discretion when it sentenced the Defendant to a within-range sentence.  We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'"  *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012).  A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment.  T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."  *Bise*, 380 S.W.3d at 707.  "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."  *Id*. at 706.  "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal.  *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences.  *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013).  A trial court has broad discretion in determining whether to impose consecutive service.  *Id*.  A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(8) (Supp. 2022).  In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed."  T.C.A. § 40-35-103(2), (4) (2025); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The record reflects that the trial court did not err in applying enhancement factor (10), that the defendant did not hesitate to commit a crime with a high risk to human life. *See* T.C.A. § 40-35-114 (10). The trial court stated in its order that enhancement factor (10) applied because the Defendant shot the victim multiple times in the parking lot of a residential area where a large number of people had been throughout the night. The Defendant contends that the court enhanced the Defendant's sentence for conduct that was inherent to the offense of especially aggravated robbery. This contention is unpersuasive, as the court did not find this enhancement factor based on the risk to the victim, but rather to the risk to those who were in the area when the Defendant fired multiple gunshots. The specific harm the Defendant's actions posed to individuals in the area of the shooting was not inherent in the offense of especially aggravated robbery.

The record does not preponderate against the trial court's determination, and its application of this enhancement factor. The trial court did not abuse its discretion. Accordingly, the Defendant is not entitled to relief on this issue.

The Defendant's claims that the trial court abused its discretion when it ordered consecutive sentencing for the Defendant's first degree felony murder and especially aggravated robbery convictions. The court's sentencing order bases its consecutive sentencing determination on information contained within the Defendant's presentence report, but the report is not contained in the appellate record. The trial court imposed consecutive sentences because the Defendant had an extensive criminal record, qualified as a dangerous offender whose behavior indicated little or no regard for human life, and committed the offenses while on probation for another offense. *Id*. § 40-35-115 (b)(2), (4), (6). It is the Defendant's responsibility to prepare a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See* T.R.A.P. 24(b); *see also State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *State v. Stack*, 682 S.W.3d 866, 876 (Tenn. Crim. App. 2023). If the appellate record is incomplete, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Miller*, 737 S.W.2d at 558 (citing *Jones*, 623 S.W.2d at 131; *Baron*, 659 S.W.2d at 815; *Taylor*, 669 S.W.2d at 699); *see Ivy*, 868 S.W.2d at 728. Accordingly, the Defendant is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE